**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

TYLER GLOVER, Individually, and as
Personal Representative Over the Estate of
DEVON EDWARD GLOVER,

       Plaintiff,

vs.                                                              No. CIV 11-0752 JB/LAM

JAN GARTMAN, Warden,
LEA COUNTY DETENTION CENTER,
BRADLEY RICE, CHRISTOPHER COLLINS,
and JAVIER RIOS, In their personal capacity and
official capacity,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants Christopher Collins and Bradley

Rice's Motion to Dismiss Plaintiff's Complaint, filed July 10, 2012 (Doc. 24)("Motion to Dismiss").

The Court held a hearing on April 25, 2012.  The primary issues are: (i) whether Defendant Bradley

Rice violated Devon Edward Glover's substantive due-process rights when Rice supplied D. Glover,

a pretrial detainee, with two razor blades and left him for two hours; (ii) whether Rice violated D.

Glover's substantive due-process rights when he did not respond timely to D. Glover's emergency

calls for help; (iii) whether Defendant Christopher Collins violated D. Glover's substantive due-

process rights when he did not respond timely to D. Glover's emergency calls for help; and (iv)

whether Rice's or Collins' alleged acts and omissions violated D. Glover's state substantive due-

process clause rights.  The Court will grant Rice and Collins' motion.  Glover has failed to state,

with sufficient specificity, a plausible claim under 42 U.S.C. § 1983 on which Rice and Collins are

not entitled to qualified immunity, because their conduct did not violate any clearly established

substantive due-process clause right of D. Glover; neither Rice nor Collins had any knowledge that D. Glover posed a suicide risk, and neither Rice nor Collins heard his calls for help.  T. Glover has also failed in his Complaint to state facts sufficient to show that the conduct of either Collins or of Rice deprived Glover of his rights under the New Mexico Constitution for which New Mexico law has waived sovereign immunity pursuant to the New Mexico Tort Claims Act, N.M.S.A. 1978 §§ 41-4-1-30 ("NMTCA").

## **FACTUAL BACKGROUND**

Consistent with the Court's duty to take the plaintiff's allegations as true under rule 12(b)(6), the Court takes its facts from T. Glover's Complaint.  The Hobbs, New Mexico police department arrested Devon Glover ("D. Glover" or "Decedent") on April 10, 2011, and incarcerated him in the Hobbs Municipal Jail.  See Complaint ¶ 14, at 3.  Sometime thereafter, D. Glover was transported to the Lea County Detention Center ("LCDC") in Lovington, New Mexico.  See id.

On April 12, 2011, D. Rice, a LCDC officer, issued Glover razors and left Glover with the razors so that Glover could shave; Glover was left for over one hour without LCDC officer supervision. See id. ¶ 10, at 3; id. ¶ 15-16, at 3-4.  D. Glover harmed himself with the razors by cutting his neck.  See id. ¶ 17, at 4.  D. Glover then "tried to communicate an emergency situation to the [LCDC] officers by pushing the emergency buttons for help." Id. ¶ 19, at 4.  "The Defendants actively ignored the emergency button and pleas for help by the Decedent for up to one (1) hour." Id. ¶¶ 20-21, at 4.  D. Glover died of his injuries at approximately 12:46 a.m. on April, 13, 2011. See id. ¶ 13, at 3.

Collins was "a guard employed by the [LCDC] and was on duty on April 12 and . . . was charged with the responsibility of maintaining the safety of the inmates."  Id. ¶ 12, at 3.  Defendant Jan Gartman was the Warden of LCDC.  See Id. ¶ 9, at 3.  Defendant Javier Rios was a lieutenant

and supervisor of LCDC and was in charge of supervising Glover's incarceration.  See id. ¶ 11, at 3.

## PROCEDURAL BACKGROUND

T. Glover ("Glover"), individually, and as personal representative over the Estate of D. Glover, filed his Complaint for Damages on August 23, 2011.  See Doc. 1.  T. Glover filed his Amended Complaint on October 17, 2011.  See Doc. 4.  T. Glover asserts three causes of action against Rice and Collins:[1] (i) Count I - actively failing to protect D. Glover's life; (ii) Count II - deprivation of constitution rights resulting in death under state law; and (iii) Count III - substantive due-process.  See Complaint at 5-9.  T. Glover is seeking compensatory and punitive damages, in addition to attorneys' fees, and costs.  See Complaint at 10.

Rice and Collins filed a motion to stay discovery pending a ruling on the Defendants' motion raising qualified immunity, filed January 10, 2012 (Doc. 23). The Court granted that motion on September 12, 2012.  See Memorandum Opinion and Order (Doc. 44).

---

[1]T. Glover's Complaint contains a fourth cause of action: "Deliberate indifference in training and supervision and ratification of unconstitutional conduct."  Complaint at 8.  Glover incorporates the general allegations and all of the allegations from Counts I-III into the allegations for Count IV.  See Complaint ¶ 39, at 8.  In Count IV, however, it may be that the claim for negligent supervision is not asserted against Rice and Collins because they are not alleged to be "supervisors," Complaint ¶¶ 10, 12, and 40-45, at 3, and 8-9.  See Armijo v. Wagon Mound Pub. Sch., 159 F.3d 1253, 1260 (10th Cir. 1998)("[S]tate actors are liable only for their own acts, and not the . . . acts of third parties").  In Count IV, T. Glover alleges that LCDC and Defendant Jan Gartman's failure to control and maintain supervision of LCDC employees, and failure to adopt or implement certain policies. Violated D. Glover's state and federal rights:

> The [LCDC] by and through its supervisory officers, including Warden Jan Gartman, failed to adopt or implement appropriate policies regarding proper and adequate communication by and between supervisors and the Lea County Detention Center staff. This lack of policies implemented by the Defendant, Lea County Detention Center supervisory staff, directly caused the Constitutional violations alleged herein and subsequent death of Decedent, Devon Glover.

Complaint ¶ 41, at 9.

On January 10, 2012, Rice and Collins filed the Motion to Dismiss.  See Doc. 24.  Rice and Collins move the Court, pursuant to rule 12(b)(6), for an order dismissing all claims against them and dismissing them as parties in the litigation.  Rice and Collins assert that dismissal of all of T. Glover's claims against them is appropriate, because: (i) qualified immunity bars the substantive due-process and Fourth Amendment claims against them in their individual capacities; and (ii) Glover's claims for Fourth Amendment Violations in Count I, substantive due-process violations in Count III, and the state law claims in Count II fail to state a claim upon which relief may be properly granted.  See Motion to Dismiss at 1.

Rice and Collins argue that the doctrine of qualified immunity applies to shield the officers from liability under T. Glover's 18 U.S.C. § 1983 ("§ 1983") claims against them,  because both Rice and Collins were acting in their official capacities as LCDC officers at all times relevant to T. Glover's claims.  See Motion to Dismiss at 3.  Rice and Collins assert that the § 1983 claims fail to show that T. Glover is entitled to relief, as the claims do not set forth with sufficient specificity that Rice's and Collins' conduct violated Glover's constitutional rights under the Fourth Amendment or the Due Process Clause of the Fourteenth Amendment, nor do the claims allege that any violated rights were clearly established.  See Motion to Dismiss at 5.

Rice and Collins contend that T. Glover's Complaint fails to sufficiently identify what acts or omissions are specifically attributable to either Collins or Rice, noting that the claims in T. Glover's Complaint identify the actors in general terms rather than specifically identifying either Collins or Rice.  See Motion to Dismiss at 6.  Rice and Collins assert that, because the complaint fails to identify either Rice or Collins as the officer responsible for the acts or omissions, the Complaint fails to "explain 'how they might be individually liable for deprivations of [D. Glover's] constitutional rights.'"  Motion to Dismiss at 7 (quoting Robbins v. Oklahoma ex. rel. Dep't of

-4-

Human Servs., 519 F.3d 1242, 1250 (10th Cir. 2008)).  Rice and Collins argue that, while two of the

counts which T. Glover asserts against them "could include claims against Officer Collins and/or

Officer Rice for violating [D.] Glover's federal constitutional rights . . .[,] neither of those counts

contains any information that demonstrates or even suggests that Officer Collins or Officer Rice's

acts or omissions violated or implicated any of [D. Glover's] federal constitutional rights."  Motion

to Dismiss at 8-9.

Additionally, Rice and Collins argue that T. Glover's Complaint fails to set forth sufficient

facts  to identify what constitutional violations T. Glover is attempting to allege.  See Motion to

Dismiss at 8.  Regarding T. Glover's claim in Count I, that Rice and Collins' conduct constituted

a deprivation of T. Glover's "rights pursuant to the Fourth Amendment of the United States

Constitution as incorporated in the due process clause of the Fourteenth Amendment," Complaint

¶ 27, at 5, Rice and Collins argue that T. Glover has failed to state a claim which may serve as a

legal basis under which relief may be properly granted, because the "Fourth Amendment, which

protects citizens against searches and seizures, does not apply to the present case."  Motion to

Dismiss at 9 (citing United States v. Thompson, 524 F.3d 1126, 1132 (10th Cir. 2008)).  Rice and

Collins assert that the United States Court of Appeals for the Tenth Circuit has held that the Fourth

Amendment is not implicated in the case of "the suicide of a pretrial detainee."  Motion to Dismiss

at 9 (quoting Barrie v. Grand County, 119 F.3d 862, 870 (10th Cir. 1997)(Briscoe, J.,

concurring)(internal quotations omitted)).  Rice and Collins argue that Count III fails to "support

or give rise to the conclusion" that Collins or Rice violated Glover's federal constitutional rights,

because Glover's claim does not identify any particular substantive due-process rights allegedly

violated.[2]  Motion to Dismiss at 10.  They assert that, "[w]ithout identifying any particular substantive due process right that may have been implicated or providing any specific facts that support such claims, Plaintiff's allegation that Defendants' actions were 'shocking to the conscience' is nothing more than a conclusory statement, which the Court is not required to accept as true."  Motion to Dismiss at 11 (quoting Complaint ¶ 38, at 8).  Finally, Rice and Collins argue that, because T. Glover failed to identify what constitutional rights Rice and Collins allegedly violated, he also failed to sufficiently allege that any constitutional rights violated were clearly established at the time of the conduct.  See Motion to Dismiss at 11.

With respect to the state law claims in Count II of T. Glover's Complaint, Rice and Collins argue that the court should dismiss these claims, because: (i) the claims fail to meet the requirements set forth in the NMTCA; (ii) the claims fail to state a claim under rule 12(b)(6) upon which relief can be granted; and (iii) the claims fail to satisfy the notice requirements set forth in rule 8.  See Motion to Dismiss at 13-19. Rice and Collins argue that T. Glover's allegations in the Complaint fail to meet the requirements for a cognizable action under the NMTCA; therefore, Rice and Collins are entitled to sovereign immunity as public employees.  See Motion to Dismiss at 14.  They assert that T. Glover's Complaint fails to comply with the requirements for bringing a claim under the NMTCA, because he "has not explicitly stated that he brings his state claims pursuant to the NMTCA" and "has not pleaded any specific section of the NMTCA."  Motion to Dismiss at 14.

Rice and Collins argue that, should the Court find that Glover's Amended Complaint complies with the NMTCA sufficient for a waiver of sovereign immunity, the Court should dismiss

---

[2]Rice and Collins assert that "substantive due process is a constitutional doctrine designed to protect fundamental rights such as family autonomy, procreation, some areas of privacy, medical care decision making, travel, voting, and access to the courts." Motion to Dismiss at 10-11 (citing Carey v. Population Servs. Int'l, 431 U.S. 678, 684-85 (1977)).

the claim under rule 12(b)(6) for failure to state a claim upon which relief may be properly granted, because T. Glover does not state any legal grounds grounded in Article II, §10 or § 18 of the Constitution of New Mexico for which he seeks relief, nor does his Complaint contain any facts establishing that Collins or Rice violated Glover's state constitutional rights. See Motion to Dismiss at 16-18.  Rice and Collins assert that these same deficiencies in Glover's Complaint merit dismissal under rule 8, because "[t]he brief and conclusory" statements alleging Collins' and Rice's violations of Glover's rights fail to satisfy the notice requirements of rule 8.  Motion to Dismiss at 19.

On February 2, 2012, T. Glover filed Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's Complaint, as Against Christopher Collins and Bradley Rice.  See Doc. 33 ("MTD Response").  T. Glover notes that, when deciding a motion under rule 12(b)(6), the Court must accept as true the complaint's well-pled factual allegations.  MTD Response at 1 (citing Seamons v. Snow, 34 F.3d 1226, 1231-1232 (10th Cir. 1996)).  He  contends that Rice and Collins are not entitled to qualified immunity, because at the time of the facts underlying his claim, T. Glover "was not a convicted prisoner, he was a pretrial Detainee [sic]," and that "the right to protection" as a detainee was clearly established at the time under the Due Process Clause of the Fourteenth Amendment.  MTD Response at 3 (citing  Farmer vs. Brennan, 511 US 825, 832 (1994); Vail v. Wolfish, 441 U.S. 520, 536, n. 16 (1979); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir.1999) Berry vs. City of Muskogee, 900 F.2d 1489, 1499 (10th Cir. 1990)).

T. Glover argues that Claims I and III should withstand a rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, because the Amended Complaint  "clearly sets forth . . . [Rice's and Collins'] individual participation in the alleged activities."  MTD Response (citing Amended Complaint ¶¶ 10, 12, at 3).  He asserts that his Complaint specifically identifies a legal basis for the claim that Rice and Collins violated a particular constitutional right, because

-7-

"even if the Fourth Amendment is not applicable to the facts as alleged herein, the general Fourteenth Amendment claim may properly serve as a legal basis for a violation of the protected constitutional rights."   MTD Response at 6.  With regard to the argument that Count III fails to plead facts showing that Rice's and Collins' actions "shocked the conscience," T. Glover asserts that he has made out a "plausible claim," because he alleges that LCDC officers "actively ignored the [emergency] call buttons," that Rice and Collins were on duty at the time, and he incorporates those allegations in his statement of relief in Claim III.  MTD Response at 7 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

        T. Glover argues that his state law cause of action in Claim II should withstand a motion to dismiss, because governmental immunity from tort liability does not apply to injuries caused by law enforcement officers while acting within the scope of their duties.  See MTD Response at 9 (citing N.M.S.A.1978, § 41-4-12; Weinstein v. City of Santa Fe, 121 N.M. 646, 916 P.2d 1313 (1996)).  He contends that his allegations that Rice gave D. Glover the razor blades, and that both Rice and Collins failed to adequately supervise and protect him from harm, make out a sufficient claim under N.M.S.A.1978, § 41-4-12 to withstand a motion to dismiss.  See MTD Response at 9.  In response to Rice and Collins' argument that he fails to adequately establish a deprivation of his state constitutional rights under the Constitution of New Mexico, T. Glover asserts that the Amended Complaint adequately states that Rice's and Collins' conduct deprived D. Glover "of his right be incarcerated without fear or loss of his life," as protected under Article II, §18 of the Constitution of New Mexico.  MTD Response at 10.

        On February 14, 2012, Rice and Collins filed Defendants Christopher Collins and Bradley Rice's Reply in Support of Their Motion to Dismiss Plaintiff's Complaint.  See Doc. 38 ("MTD Reply").  Rice and Collins assert that T. Glover cites and relies upon the incorrect legal standard in

responding the Motion to Dismiss:

> All of the cases Plaintiff cited in his legal standard section reflect the Supreme Court's iterations of the <u>Conley v. Gibson</u>, 355 U.S. 41 (1957), standard that governed a court's review on a motion to dismiss before it was retired by <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), and <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009). Specifically, Plaintiff asserts that "[a] Motion to Dismiss should not be granted unless it appears beyond a doubt, that the Plaintiff cannot prove a set of facts to justify relief." (Resp. at 2.) The Supreme Court explicitly rejected this standard when it decided <u>Twombly</u> . . . .

MTD Reply at 2. They argue that, under the correct standard for ruling on a motion to dismiss on the basis of qualified immunity, "a plaintiff 'must make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations.'" MTD Reply at 3 (quoting <u>Robbins v. Okla.</u>, 519 F.3d 1242, 1250 (10th Cir. 2008)). Rice and Collins contend that T. Glover's statements fail to meet this standard, because his Amended Complaint lacks "any allegations against [Collins or Rice] that demonstrate or even suggest that [Collins or Rice] violated the Decedent's constitutional rights by taking specific actions." MTD Reply at 5.

Rice and Collins also assert that T. Glover, in his MTD Response, "concedes that the Fourth Amendment of the Constitution of the United States and Article II, Section 10 of the Constitution of New Mexico apply to the facts of this case," and that the Court should dismiss Counts I and III to the extent either rely on those constitutional provisions. MTD Reply at 6 (citing MTD Response at 5-6). Regarding T. Glover's substantive due -process rights argument, Rice and Collins argue that T. Glover's MTD Response shows that the Complaint fails to specifically assert that the conduct of either Collins or Rice violated Glover's rights. <u>See</u> MTD Reply at 7. They state that the allegations to which T. Glover refers in his MTD Response only "refer to 'Lea County Detention Center and its Officers' and to 'Lea County Detention Center officers and employees' . . . [and that] these

general allegations cannot overcome Officer Collins and Officer Rice's qualified immunity defense, as they are the very kind that have been expressly rejected by this Court." MTD Reply at 7-8 (citing Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F.Supp.2d 1200 (D.N.M. 2011)(Browning, J.)). Regarding the state law claims set out in Count II of Glover's Complaint, Rice and Collins assert that T. Glover's MTD Response argument, that Rice and Collins are not entitled to immunity, must fail:

> [B]ecause simply asserting that Officer Collins and Officer Rice are not entitled to immunity against Plaintiff's claims is in no way tantamount to correctly pleading the specific section of the New Mexico Tort Claims Act under which Officer Collins and Officer Rice are deemed to have waived their immunity as public employees.

MTD Reply at 9-10.

The Court held a hearing on April 25, 2012. Rice and Collins argued that the Complaint fails to show that T. Glover is entitled to relief, and that the Court should dismiss because his Complaint fails make clear who is "alleged to have done what to whom." Transcript of Hearing at 6:4 (April 25, 2012)(Heflick)("Tr.").[3] The Court asked Rice and Collins whether the Complaint, taken as a whole, did not adequately "give the contours," and make reasonably clear that Officer Rice provided D. Glover with the razor blades, while Officer Collins did not respond quickly enough to D. Glover's emergency call button. See Tr. at 6:17-22 (Court). Rice and Collins contended that T. Glover must "identify in each count of their Complaint, exactly which defendant took what action." Tr. at 7:25-8:1 (Heflick). They contend that T. Glover's Complaint fails to meet the qualified immunity pleading requirements, because it fails to provide them with "notice about what claims are being alleged against them and why." Tr. at 9:17-18 (Heflick).

---

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

In regards to the § 1983 claims, T. Glover clarified that he has abandoned his Fourth Amendment claim, Claim I, leaving the alleged substantive due-process violations in Count III as the only federal issue. Tr. at 10:9-10:13 (Court, Proctor).  Rice and Collins argued that the substantive due-process clause claim in Count III also fails, because, rather than stating sufficient factual allegations to state a plausible claim for relief, T. Glover provides "a bare statement" that the "conduct of the defendants is shocking to the conscience." Tr. at 11:24-12:3 (Heflick).  As to the state law claims in Claim II, Rice and Collins argued that, even if the Court found that Rice and Collins were acting as law enforcement officers within the scope of their duties, the Complaint still fails, because Glover fails to plead any state constitutional rights Rice and Collins are alleged to have violated.  See Tr. at 14:4-10 (Heflick).  The Court asked Rice and Collins whether they had any authority addressing the issue whether LCDC employees meet the definition of law enforcement officers under N.M.S.A.1978, § 41-4-12.  See Tr. at 14:12-13 (Court).  Rice and Collins responded that they did not have any such authority, but that T. Glover has not affirmatively shown that they meet the definition under New Mexico law.  See Tr. at 14:20-21 (Heflick).  Rice and Collins reiterated their argument that the state law claims also cannot withstand a motion to dismiss, as they fail to identify the particular NMTCA section and the claim fails to state sufficient facts to show that T. Glover is entitled to relief.  See Tr. at 15:12-25 (Heflick, Court).  Rice and Collins then asked that the Court dismiss the claims against them with prejudice.  See Tr. at 16:3-5.

T. Glover then argued in opposition to Rice and Collins' motion, asserting that the claims against Rice and Collins are for failing to protect D. Glover from committing suicide with the razor blades provided to him while he was a pretrial detainee -- a right, he contends, that is guaranteed under the substantive due-process clause.  See Tr. at 16:23-17:12 (Proctor, Court). The Court asked Glover whether he has any more facts at this stage of the proceeding as to Collins or Rice's specific

involvement or actions in the incidents leading to D. Glover's death than what he pled.  See Tr. at 16:10-14 (Court).  T. Glover conceded that he does not have any more facts that he can plead.  See Tr. at 16:15-22 (Proctor, Court).  T. Glover clarified that his theory against Rice is that he gave D. Glover two razor blades, he did not supervise him, and he did not return until one hour later.  See Tr. at 16:23-17-4.  His theory against Collins, he stated, is that Collins was charged with the responsibility for "maintaining the safety of the inmates and he didn't do it."  Tr. at 18:18-20 (Proctor).

The Court asked whether T. Glover had information that LCDC, Collins, or Rice knew D. Glover was mentally unstable, had mental problems, or was suicidal.  See Tr. at 18:22-24 (Court).  T. Glover responded that, on D. Glover's prison intake sheet, obtained via a public information request, the blank provided to check yes or no for psychological problems had been left blank.  See Tr. at 18:25-19:8 (Proctor).  He stated that this omission is significant, because whoever performed D. Glover's intake "checked all the other questions."  Tr. at 19:12-13 (Proctor).  T. Glover, concedes, however that he cannot allege that either Collins or Rice ever saw the intake form or were in any way involved in D. Glover's intake process.  Tr. at 20:18-25 (Proctor).  When the Court asked whether he can point the Court to any authority that has found a substantive due-process clause violation in the context of prisoner or detainee suicide, T. Glover conceded that he cannot.  See Tr. at 21:1-7 (Court, Proctor).  T. Glover stated that the prisoner suicide cases are normally discussed in the context of an Eighth Amendment violation, but under Tenth Circuit precedent, although the analysis is the same as the Eighth Amendment, a pretrial detainee's rights are classified as substantive due-process clause rights under the Fourteenth Amendment.  See Tr. at 21:7-16 (Proctor).  T. Glover argued that Collins' and Rice's actions violated his substantive due-process rights, because Rice's conduct in providing razor blades without supervision, and Collins' conduct

in not coming to his aid when Glover pressed the alarm button, shock the conscience.  See Tr. at 22:18-23:19 (Proctor).

In regards to the state law claims in Claim II, T. Glover asserted that he was indeed bringing his action under N.M.S.A.1978, § 41-4-12, and contended that, because LCDC houses detainees, Rice and Collins are law officers for NMTCA's purposes.  See Tr. at 29:10-30:15 (Proctor, Court).

The Court then asked Rice and Collins whether they had anything further on the motion.  See Tr. at 37:11 (Court).  Rice and Collins asserted that T. Glover's contention that Collins was charged with maintaining the safety of the detainees was false.  See Tr. at 37:14-15 (Heflick).  Rice and Collins maintain that he was in a different area of the prison and that his duty as an officer at LCDC did not include any responsibilities with regards to D. Glover.  See Tr. at 37:16-22 (Heflick).  Rice and Collins also contended that neither had knowledge of any information that may have been on the intake forms because neither of them were involved in D. Glover's intake into LCDC.  See Tr. at 28:18-39:1 (Heflick).  Finally, Rice and Collins contended that T. Glover's Complaint, based on his explanation that the general allegations at the beginning are incorporated by reference into the rest of the Complaint, does not meet the standard required for pleadings that survive a rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.  See Tr. at 39:3-6 (Heflick).

On May 25, 2012, Rice and Collins filed Defendants Christopher Collins and Bradley Rice's Notice of Supplemental Authorities on Document 24, see Doc. 43, bringing Estate of Hocker v. Walsh, 22 F.3d 995 (10th Cir. 1994), to the Court's attention in response to the Court's inquiry whether Collins or Rice had any Tenth Circuit opinions on pretrial detainee suicide.

## LAW REGARDING RULE(12)(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial

plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 did create any substantive rights, but merely enforces existing constitutional and federal statutory rights . . ."). Section 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of

-15-

state law, violated the claimant's federally protected rights.  To state a claim upon which relief can

be granted under § 1983, a plaintiff must allege:  (i) a deprivation of a federal right; and (ii) that the

person who deprived the plaintiff of that right acted under color of state law.  See West v. Aikins,

487 U.S. 42, 48 (1988).  The Court has noted:

> [A] plaintiff must establish (1) a violation of rights protected by the federal
> Constitution or created by federal statute or regulation, (2) proximately caused (3)
> by the conduct of a "person" (4) who acted under color of any statute, ordinance,
> regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Public School Dist., 716 F.Supp.2d 1052, 1063 (D.N.M. 2010)(Browning,

J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Supreme Court

has made clear, that in alleging a § 1983 action against a government agent in the agent's individual

capacity, "a plaintiff must plead that each Government-official defendant, through the official's own

individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

### LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive

any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.

In general, state actors may be held liable under § 1983 only for their own affirmative acts that

violate a plaintiff's due process rights, and not for third parties' acts.  See Robbins v. Oklahoma, 519

F.3d 1242, 1251 (10th Cir. 2008)(citing DeShaney v. Winnebago County of Dep't of Soc. Servs.,

489 U.S. 189, 197 (1989)).  "[N]othing in the language of the Due Process Clause itself requires the

State to protect the life, liberty and property of its citizens against invasion by private actors."

DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause

is not a guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago County

Dep't of Soc. Servs., 489 U.S. at 195.  "As a general matter, . . . a state's failure to protect an

-16-

individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. at 197. See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1125 (10th Cir. 2008)). Generally, negligence does not trigger the Due Process Clause's protections. See Davidson v. Cannon, 474 U.S. 344, 348 (1986).

### 1.   Exceptions to the General Rule.

There are, however, two exceptions to this general rule. First, the special-relationship doctrine arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual. See Christianson v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-995 (10th Cir. 1994). Second, the danger-creation theory provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'" Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).

### 2.   Special-Relationship Doctrine.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due-process clause is the special-relationship doctrine. A plaintiff must show the government's involuntary restraint to establish a duty to protect under the special-relationship doctrine. See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996). "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)." Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995). A pretrial detention is one such relationship. See Lopez v. LeMaster, 172 F.3d 756, 759 n. 2 (10th

Cir. 1999); Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 277 (10th Cir. 1996)("it [is] clearly established that state officials had a duty to protect individuals whom they had taken involuntarily into their physical custody and control.").

### a.   Due-Process Clause Rights of Pretrial Detainees.

The special-relationship doctrine imposes upon prison officials the responsibility to take "reasonable measures to insure the safety of the [detainees]." Lopez v. LeMaster, 172 F.3d at 759. "In fact, the due process rights of a person in [this] situation are at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244. In the Tenth Circuit, a pretrial detainee's due-process clause rights parallel that of an inmate's Eight Amendment rights: "Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment. In determining whether appellant's rights were violated, however, we apply an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." Lopez v. LeMaster, 172 F.3d at 759 n. 2 (citing Bell v. Wolfish, 441 U.S. 520, 535 n. 16 (1979)). Accord Luckert v. Dodge County, 684 F.3d 808 (8th Cir. 2012)("Under the Fourteenth Amendment, pretrial detainees are entitled to at least as great protection as that afforded convicted prisoners under the Eighth Amendment.").[4]

––––––––––––––––––––

[4]When government officials hold an individual in confinement before the formal adjudication of that individual's guilt, the Eighth Amendment does not regulate the conduct of the government officials confining that individual. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). As the Supreme Court has explained:

"Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions . . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."

City of Revere v. Mass. Gen. Hosp., 463 U.S. at 244 (quoting Ingraham v. Wright, 430 U.S. 651, 671-672, n.40 (1977)).

**b.**     **Prison Officials' Duty to Insure the Safety of Inmates and Detainees.**

The Supreme Court has held that "a prison official's 'deliberate indifference' to a substantial risk of serious harm" implicates the Eighth Amendment.  Farmer v. Brennan, 511 U.S. 825, 828 (1994).  "[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners," but "[t]hey are . . . responsible for taking reasonable measures to insure the safety of inmates." Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).  An official violates the Eighth Amendment when two elements are met: (i) the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities"; and (ii) the official has a "sufficiently culpable state of mind."  Farmer v. Brennan, 511 U.S. at 834 (internal quotation marks omitted).  The second condition represents the functional application of the deliberate indifference standard.  See Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006)(holding that prison officials violate detainees' due-process clause rights when the officials' "acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs.")(quoting Estelle v. Gamble, 429 U.S. 87, 106 (1976)).

Analyzing whether the plaintiff has satisfied the first element, the objective element, "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such an injury to health will actually be caused." Helling v. McKinney, 509 U.S. 25, 36 (1993).  Courts should also consider "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. at 36 (emphasis in original).  "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36.  The Eighth Amendment does not protect against "de minimis uses of physical force, provided that the use of force is not of a sort repugnant

-19-

to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992)(internal quotation marks omitted)("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action.").

The second element regarding the government official's state of mind is a subjective inquiry. See Wilson v. Seiter, 501 U.S. 294, 298 (1991). Courts apply this subjective inquiry whether the allegations are that a "short-term" or "one-time" violation occurred, or that "continuing" or "systemic" violations occurred. Wilson v. Seiter, 501 U.S. at 299. A defendant has the requisite culpable state of mind under the subjective inquiry only where the defendant's conduct evidences conscious disregard of a substantial risk of harm. See Self v. Crum, 439 F.3d at 1231.

> A prison official cannot be liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

Self v. Crum, 439 F.3d at 1231 (quoting Farmer v. Brennan, 511 U.S. at 837). The Supreme Court has stated: "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." Farmer v. Brennan, 511 U.S. at 836. For the purpose of Eighth Amendment analysis, the Tenth Circuit has equated deliberate indifference with recklessness. See Belcher v. United States, 216 F.App'x 821, 823-24 (10th Cir. 2007)(unpublished)(quoting Smith v. Cummings, 445 F.3d at 1258).

        **c.**      **Detainee Suicide.**

For a detainee suicide, a plaintiff must prove the prison official was deliberately indifferent to the detainee's risk of suicide:

> Claims arising from a failure to prevent prisoner suicide are considered and treated

as claims based on the failure of jail officials to provide medical care for those in their custody. Thus, a plaintiff bringing such a claim must prove that his jailer was "deliberately indifferent to a substantial risk of suicide."

Gaston v. Ploeger, 229 F.App'x 702, 709-710 (10th Cir. 2007)(unpublished opinion)(quoting Barrie v. Grand County, 119 F.3d 862, 869 (10th Cir. 1997)). In Gaston v. Ploeger, the Tenth Circuit held that the objective component of the test is always satisfied in the case of suicide, because the harm suffered is "[o]bviously" sufficiently serious. 229 F.App'x at 710. For the subjective component to be met, however, the Tenth Circuit held that there must be evidence either that the prison official had "knowledge that an inmate is suicidal" or the inmate must have been "an obvious suicide risk." Gaston v. Ploeger, 229 F.App'x at 712. "[T]he threshold for obviousness is very high." Gaston v. Ploeger, 229 F.App'x at 710 (citing Perez v. Oakland County, 466 F.3d 416, 435-36 (6th Cir. 2006), and Collins v. Seaman, 462 F.3d 757, 761 (7th Cir. 2006)).

### 3.    Danger-Creation Exception.

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573. The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). Under a danger-creation theory, there will be no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. To state a prima-facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious

and known; (v) and the defendant must have acted recklessly in conscious disregard of that risk.

See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008).

The Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City & County of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992).  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & County of Denver, 960 F.2d at 1496.

### 4.    What Shocks the Conscience.

If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of "shocking the conscience."  See Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. The City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006) (quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. the City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995))(internal quotations omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law;

-22-

and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. the City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge.  See James v. Chavez, 830 F.Supp.2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(finding that the use of deadly force did not shock the conscience even if the suspect did not have intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively.").  Even where a government acts with sufficient culpability for tort liability, perhaps warranting even punitive damages, the Court has found that the government's conduct still failed to rise to the level of shocking the conscience. See Schaefer v. Las Cruces Pub. Sch. Dist., 716 F.Supp.2d 1052, 1074-1075 (D.N.M. 2010)(Browning, J.)(finding that school's failure to act after three complaints about conduct that could "arguably be characterized as sexual assault," and then pointing out the plaintiff as the victim at a school assembly regarding the conduct, "may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages," but did not shock the conscience.)

Because "the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner," see County of Sacramento v. Lewis, 523 U.S. 833, 849-50 (1998)(quoting City of Revere v. Massachusetts Gen. Hospital, 463 U.S. at 244), a finding of deliberate indifference in a claim for failure to provide for a detainee's serious medical needs shocks the conscience as a matter of law:

> Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls.  To be sure, we have expressly recognized the

-23-

> possibility that some official acts in this range may be actionable under the Fourteenth Amendment, and our cases have compelled recognition that such conduct is egregious enough to state a substantive due process claim in at least one instance. We held in <u>City of Revere v. Massachusetts Gen. Hospital</u>, 463 U.S. 239 . . . (1983), that the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner.  Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, . . . it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial.

<u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. at 849-50 (internal citations and quotations omitted).

## <u>LAW REGARDING QUALIFIED IMMUNITY</u>

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  <u>Roybal v. City of Albuquerque</u>, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991)).  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."  <u>Pearson v. Callahan</u>, 555 U.S. at 232 (quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)(per curiam)).   "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  <u>Lewis v. Tripp</u>, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Pearson v. Callahan</u>, 555 U.S. at 231 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs" and operates

-24-

to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.      Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting a mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that a mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed

directly to and "should address only" the clearly established prong of the qualified immunity analysis:

> [W]hen (1) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (2) "it appears that the question will soon be decided by a higher court"; (3) deciding the constitutional question requires "an uncertain interpretation of state law"; (4) "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify"; (5) tackling the first element "may create a risk of bad decisionmaking" due to inadequate briefing; (6) discussing both elements risks "bad decisionmaking" because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (7) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question because "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."

Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern where guidance on the constitutionality of the challenged conduct is necessary and the conduct is only likely to face challenges in the qualified immunity context. Camreta v. Greene, 131 S.Ct. 2020, 2031-32 & n.5 (2011).  See Kerns v. Bader, 663 F.3d at 1181. "Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2080 (2011).  Camreta v. Greene, 131 S.Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[5]  The Tenth Circuit will remand a case to the district court for further

---

[5]While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S.Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large"

consideration when the district court has given cursory treatment to the qualified immunity issue.

See Kerns v. Bader, 663 F.3d at 1182.

---

and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly for a trial judge.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are relatively good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

    If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for civil rights plaintiffs.  The three most recent qualified immunity cases with which the Supreme Court has dealt are: (i) Reichle v. Howards, 132 S.Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S.Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S.Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S.Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual whom the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations.  See 132 S.Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S.Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the suicide of a pretrial detainee in the custody and under the control of a state-run penitentiary.

    On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

2.    __Clearly Established Rights in the Qualified Immunity Analysis__.

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colorado Dept. Of Corrections, 429 F.App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity

test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."
Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2083 (2011).  While a case directly on point is not required, the Supreme Court held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S.Ct. at 2083.  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. Iqbal, 131 S.Ct. at 2084.  The level of generality at which the legal rule is defined is important because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader, that although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case  law," the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  Kerns v. Bader, 663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights,

509 F.3d 1278,1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation").  If the law is clearly established, "when an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## RELEVANT LAW REGARDING PLEADING ALLEGATIONS IN THE CONTEXT OF QUALIFIED IMMUNITY

A plaintiff must plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The "degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context: . . .  Fair notice under Rule 8(a)(2) depends on the type of case."  Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008)(citing Phillips v. County of Allegheny, 515 F.3d 224, 231-232 (3d Cir. 2008).  Although the same standard applies "in evaluating dismissals in qualified immunity cases as to dismissals generally,  complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants."  Robbins v. Oklahoma, 519 F.3d at 1249 (quoting Shero v. City of Grove, 510 F.3d 1196, 1200 (10th Cir. 1997))(internal quotations omitted).  The Tenth Circuit has articulated the standard required to give adequate notice to government actors sued in their individual capacities under § 1983:

> In § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities.  Therefore, it is particularly important in such circumstances that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the

basis of the claims against him or her, as distinguished from collective allegations against the state.

Robbins v. Oklahoma, 519 F.3d at 1249-1250 (emphasis in original).

## LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." N.M.S.A. 1978, § 41-4-2(A). The New Mexico Legislature, however, also recognized

that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M.S.A. 1978, § 41-4-2(A). As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." N.M.S.A. 1978, § 41-4-2(A). The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." N.M.S.A. 1978, § 41-4-2(C)). The NMTCA is the

exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M.S.A. 1978, § 41-4-17(A).

A plaintiff may not sue a governmental entity of New Mexico or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions granted for governmental entities and public employees in the NMTCA. See Begay v. State, 104 N.M. 483, 486, 723 P.2d 252, 255 (Ct. App. 1985)("Consent to be sued may not be implied, but must come within one of the

exceptions to immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay, 104 N.M. 375, 721 P.2d 1306 (1986).  "A plaintiff also may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity."  Lymon v. Aramark Corp., 728 F.Supp.2d at 1251.  Accord Barreras v. State of N.M. Corr. Dep't, 133 N.M. 313, 319, 62 P.3d 770, 776 (Ct. App. 2003)("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act."); Chavez v. City of Albuquerque, 124 N.M. 479, 482, 952 P.2d 474, 477 (Ct. App. 1998)(noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives immunity); Rubio v. Carlsbad Mun. Sch. Dist., 106 N.M. 446, 449, 744 P.2d 919, 922 (Ct. App. 1987)(holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board); Begay v. State, 104 N.M. at 488, 723 P.2d at 257 (finding that no waiver existed in NMTCA for suit for damages under Article II, § 11 of the New Mexico Constitution -- a provision that protects the "free exercise of religion").  Thus, if no specific waiver can be found in the NMTCA, the Court must dismiss a plaintiff's complaint against the governmental entity or its employees.  See Begay v. State, 104 N.M. at 486, 723 P.2d at 255.

    Section 41-4-12 of the NMTCA provides a waiver of immunity for enforcement officers' negligence or intentional conduct in causing certain specified torts.  See Oliveros v. Mitchell, 449 F.3d 1091, 1096 (10th Cir. 2006)(citing Methola v. Cnty. of Eddy, 95 N.M. 329, 333, 622 P.2d 234, 238 (1980); Caillouette v. Hercules, Inc., 113 N.M. 492, 497, 827 P.2d 1306, 1311 (Ct. App. 1992)). Section 41-4-12 provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12.

> [I]n order to state a tort claim under the waiver of immunity set out in Section 41-4-12, a plaintiff must demonstrate that the defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law.

Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 121 N.M. 646, 649, 916 P.2d 1313, 1316 (1996).  Section 41-4-12 does not, however, waive law enforcement officers' sovereign immunity for conduct which amounts to simple negligence.  See Caillouette v. Hercules, Inc., 113 N.M. at 497, 827 P.2d at 1311.  The Supreme Court of New Mexico has stated that "no case has held that simple negligence in the performance of a law enforcement officer's duty amounts to commission of one of the torts listed in [§ 41-4-12]."  Bober v. N.M. State Fair, 111 N.M. 644, 654, 808 P.2d 614, 624 (1991).  The Court of Appeals for New Mexico has construed § 41-4-2A of the NMTCA as "evincing a legislative intent not to waive immunity for injuries to indirect or incidental victims of tortuous acts committed by government employees."  Lucero v. Salazar, 117 N.M. 803, 806, 877 P.2d 1106, 1109 (Ct. App. 1994).

The Supreme Court of New Mexico has realized that law enforcement officers may waive their liability for tortuous conduct under the NMTCA, even if the officers' tortuous acts do not amount to a deprivation of constitutional rights.  See Wells v. Valencia County, 98 N.M. 3, 6, 644 P.2d 517, 519 (1982)("[n]ot all tortuous conduct subject to liability under state law amounts to "cruel and unusual punishment" in violation of [the Eighth Amendment].").  To find sovereign

immunity waived under § 41-4-12 for conduct which amounts to negligence, however, only "'those

acts enumerated . . . which were caused by the negligence of law enforcement officers while acting

within the scope of their duties' are actionable."   Murphy v. Bitsoih, 320 F.Supp.2d 1174, 1204-

1205 (D.N.M. 2004)(Vazquez, J.)(quoting Methola v. County of Eddy, 95 N.M. 329, 333, 622 P.2d

234 (1980)).

## ANALYSIS

Rice and Collins contend that dismissal of all of Glover's claims against them is appropriate.

In regards to Rice's and Collins' conduct that allegedly violated T. Glover's rights, the Complaint

frequently makes reference to conduct of LCDC, the "Defendants," LCDC "officers," or "its officers

and its employees," but does not state within the allegations for any of the four claims, conduct by

either Collins or Rice specifically.   See, e.g., Complaint ¶ 26, at 5 ("The Lea County Detention

Center and its officers and employees actively ignored pleas for help by the Decedent, DEVON

GLOVER, while he was incarcerated in the Lea County Detention Center awaiting trial.").   T.

Glover make only specific allegations as to Rice's or Collins' conduct in the "General Allegations":

"Plaintiff alleges that Defendant, BRADLEY RICE, supplied two razor blades to the Decedent,"

Complaint ¶ 10, at 3, and "Defendant, CHRISTOPHER COLLINS, was a guard employed by the

Lea County Detention Center and was on duty on April 12 and at all times material hereto and was

charged with the responsibility of maintaining the safety of the inmates," Complaint ¶ 12, at 3.  T.

Glover incorporates the "General Allegations" into each of the counts in his complaint.  See e.g.,

Complaint ¶ 37, at 8.

Upon initial review of Glover's Complaint, the Court thought this case most appropriately

fits into a claim for a failure to prevent detainee or prisoner suicide in violation of D. Glover's

substantive due-process clause rights.  See Gaston v. Ploeger, 229 F.App'x at 709-710 (stating that

for  "[c]laims arising from a failure to prevent prisoner suicide . . . a plaintiff . . .  must prove that

his jailer was deliberately indifferent to a substantial risk of suicide.").[6]  Because T. Glover is not

alleging that Rice or Collins was acting in a supervisory role,[7] T. Glover must sufficiently state a

plausible claim that Rice's and Collins' acts and omissions evidence a deliberate indifference to D.

Glover's serious medical needs.  Even under this theory, however, the Court finds that T. Glover's

Complaint fails to state a plausible federal claim either against Collins or against Rice.

I.      **THE COURT WILL DISMISS THE § 1983 CLAIMS BASED ON THE FOURTH
        AMENDMENT AGAINST RICE AND COLLINS.**

        T. Glover's claims in Count I do not state a claim upon which relief may be properly granted

---

[6]The Complaint is unclear as to the specific substantive due-process clause right Glover is asserting has been violated by Collins or Rice that would allow him to bring a federal claim against them pursuant to 42 U.S.C. § 1983.  The Complaint makes reference to Fourth Amendment rights, which Glover has abandoned, and substantive due-process rights, but for the substantive due-process clause claim, alleges only: "The conduct of the Defendants as described herein is shocking to the conscience, and violated Plaintiff's Substantive Due Process Rights under the Fourteenth Amendment to the United States Constitution." Complaint ¶ 38, at 8.  In Count I, although T. Glover pleads that he is bringing his claim pursuant to the Fourth Amendment as incorporated in the Due Process Clause of the Fourteenth Amendment, see Complaint ¶ 27, at 5, because the title reads, "Count I - Actively Failing to Protect the Life of the Decedent," the Court believes that Counts I and III, when viewed in the light most favorable to the plaintiffs, allege a claim for a failure to prevent detainee suicide.

[7]Under 42 U.S.C. § 1983, in addition to an action against a prison official because the individual's conduct evidenced a deliberate indifference to a plaintiff's serious medical needs, a plaintiff can maintain a cause of action against a supervisor where the plaintiff can allege "an affirmative link exists between the constitutional deprivation and either the supervisor's participation, his exercise of control or direction, or his failure to supervise" and the death of an inmate or detainee." Gaston v. Ploeger, 229 F.App'x 702, 712 (10th Cir. 2007)(unpublished opinion)(quoting Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988).  Although T. Glover alleges that Rice provided D. Glover razor blades to shave and then left D. Glover "with the razor blades unsupervised and unwatched," these allegations and the allegations against Collins cannot serve as the basis for a 42 U.S.C. § 1983 claim for supervisor liability.  A supervisor liability claim, rather, can only be claimed against an individual acting in a supervisory role, such as a warden or a sheriff, and not an individual officer.  See Meade v. Grubbs, 841 F.2d at 1528 ("A supervisor or municipality may be liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable.").

because the Fourth Amendment is not implicated in the case of "the suicide of a pretrial detainee."

Barrie v. Grand County, 119 F.3d 862, 870 (10th Cir. 1997)(Briscoe, J., concurring)("Although I

agree summary judgment for defendants is appropriate in this case, I write separately because I

disagree with the majority's conclusion that Fourth Amendment protections against unreasonable

seizures cannot be implicated in the suicide of a pretrial detainee.").  Rather, the constitutional rights

of a pretrial detainee to be free from cruel and unusual punishment are protected under the Due

Process Clause of the Fourteenth Amendment.  See Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir.

1999).  Claim I in T. Glover's Complaint, therefore, alleging a cause of action under § 1983 based

on violation of D. Glover's Fourth Amendment rights, fails to state a claim against Rice and Collins

upon which relief can be granted.  At the hearing, T. Glover abandoned his Fourth Amendment

claim against Rice and Collins.  Accordingly, the Court will dismiss the Fourth Amendment Claim

against Rice and Collins.

## II.    THE COURT WILL DISMISS THE § 1983 CLAIMS BASED ON SUBSTANTIVE DUE-PROCESS RIGHTS THAT D. GLOVER BRINGS AGAINST RICE AND COLLINS IN THEIR INDIVIDUAL CAPACITIES.

The Tenth Circuit has indicated that, to survive a rule 12(b)(6) motion to dismiss based on

qualified immunity, a plaintiff must "'nudge their claims across the line from conceivable to

plausible,' [by] alleg[ing] facts sufficient to show (assuming they are true) that the defendants

plausibly violated [the plaintiff's] constitutional rights, and that those rights were clearly established

at the time."  Robbins v. Oklahoma, 519 F.3d at1249 (quoting Bell Atlantic Co. V. Twombly, 550

U.S. at 547).  This standard places the burden on T. Glover to allege sufficient facts to show that

Rice's and Collins' conduct violated D. Glover's clearly established right.  See Robbins v.

Oklahoma, 519 F.3d at 1249.  To state a claim for a failure to adequately prevent a detainee from

committing suicide, T. Glover must allege sufficient facts to plausibly find that Rice and Collins

acted with deliberate indifference to the needs of D. Glover, meaning T. Glover must allege that Rice and Collins knew that D. Glover was suicidal, or that Rice and Collins appreciated and disregarded facts that evidenced D. Glover was "an obvious suicide risk." Gaston v. Ploeger, 229 F.App'x at 712.  There is no constitutional duty upon prison officials to monitor inmates constantly. See Gaston v. Ploeger, 229 F.App'x at 711 ("[J]ailers are neither obligated nor able to watch every inmate at every minute of every day.").

### A.   RICE IS ENTITLED TO QUALIFIED IMMUNITY ON THE CONSTITUTIONAL CLAIM AGAINST HIM BECAUSE HE DID NOT VIOLATE D. GLOVER'S DUE-PROCESS CLAUSE RIGHTS.

Rice did not violate D. Glover's substantive due-process right by giving D. Glove two razor blades and leaving him for over an hour so that D. Glover could shave before trial.  There is no clearly established right that jail or prison officials not provide a detainee razor blades or that jail guards stay with a detainee while he shaves in the absence of knowledge that the detainee is a suicide risk.  Here, Rice had no knowledge that D. Glover posed any suicide risk when Rice left D. Glover to shave for trial.

### 1.   Rice did not Violate D. Glover's Substantive Due-Process Clause Rights.

T. Glover's Complaint alleges that Rice provided D. Glover with two razor blades and left him for over an hour so that D. Glover could shave before his trial.  Viewing T. Glover's allegations in "the light most favorable" to T. Glover and making all reasonable inferences in his favor, Smith v. United States, 561 F.3d at 1098, Rice's conduct, in providing D. Glover the razors and failing to monitor him while he shaved, was not a failure to prevent detainee suicide in violation of D. Glover's substantive due-process rights.  Rice did not know that D. Glover posed any suicide risk.

T. Glover, at the hearing, stated that he was relying on Lopez v. LeMaster for the proposition that Rice's failure to maintain D. Glover's safety was a failure to protect a detainee, and thus a

deprivation of Glover's substantive due process rights.  See Tr. at 17:23-20 (Proctor, Court).  T. Glover is therefore not alleging that Rice was an officer included in the allegation that LCDC officers and its employees "actively" ignored D. Glover's pleas for help.  Complaint ¶ 26, at 5. Nevertheless, the Court will analyze whether Rice violated D. Glover's substantive due-process rights by not responding in a timely manner to D. Glover's call for help.

T. Glover's Complaint does not allege any facts that would lead a reasonable person to infer either that Rice knew D. Glover would try to kill himself with the razor, or that D. Glover was an obvious suicide risk, and thus there is no allegation that Rice ignored these risks after he understood and appreciated them.  In Estate of Hocker by Hocker v. Walsh, the Tenth Circuit held that the jail officials were entitled to summary judgment on a claim that they were deliberately indifferent to the plaintiff's risk of suicide, because there were no "facts suggest[ing] that [the plaintiff's] risk of suicide was so substantial or pervasive that knowledge can be inferred."  22 F.3d at 1000.  Where the plaintiff, a pretrial detainee, alleged that the detention center employees should be deemed to know of her suicide risk, because she was intoxicated and under the influence of drugs, the Tenth Circuit disagreed, holding that the plaintiff failed to show the prison officials knew she "posed a specific risk of suicide."  Estate of Hocker by Hocker v. Walsh, 22 F.3d at 100 (citing Colburn v. Upper Darby Township, 946 F.2d 1017, 1026 (3d Cir. 1991)).  There are no facts alleged in the Complaint alleging that D. Glover was a specific suicide risk, and when given the chance at the hearing to say that he could amend and allege such facts, T. Glover could not allege that Rice had any knowledge of facts that could have put Rice on notice that D. Glover intended to kill or injure himself.

At the hearing, T. Glover stated that, since filing the Complaint he had come across the fact that the box for psychological problems on D. Glover's intake form had not been checked either yes

or no, while all of the other questions on the form had been answered.  See Tr. At 18:25-19:13 (Proctor).  T. Glover, concedes, however that he cannot allege that either Collins or Rice ever saw the intake form or were in any way involved in D. Glover's intake process.  Tr. at 20:18-25 (Proctor).  The intake form, therefore, does not help T. Glover.  It is doubtful that the detainee's failure to check the box for psychological problems on an intake form would be equal to knowledge that the detainee was a suicide risk; it may be negligent of an intake person not to follow up, but it does not rise to the level of deliberate indifference not to do so.  The Court does not need to opine on that question, however, because Rice never saw the intake form.   Because D. Glover has not provided the Court with any allegations that Rice was aware D. Glover intended to commit suicide, or that he was aware of facts suggesting that D. Glover's risk of suicide was so substantial or pervasive that Rice's knowledge could be inferred, D. Glover has failed to state,  with sufficient specificity, Rice's conduct plausibly violated D. Glover's due-process right.   Thus, qualified immunity bars T. Glover's substantive due-process clause claims against Rice, and the Court will dismiss the claims against him.

### 2.   A Detainee's Substantive Due-Process Right of Not to Be Left Alone with Razor Blades is Not Well Established.

The burden of overcoming qualified immunity requires that the violation be of a constitutional right that is clearly established; that is, the prison official's conduct must have violated a clearly established right of which a reasonable prison official would have known.  See Pearson v. Callahan, 555 U.S. at 231 ("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'")(quoting Harlow v. Fitzgerald, 457 U.S. at 818).  To meet the burden of showing that the right was clearly established

at the time of the conduct, T. Glover brings to the Court's attention Lopez v. LeMaster, and Berry v. City of Muskogee.  Although these cases both address claims for failure of prison officials to adequately protect prisoners, because neither of these cases address detainee or inmate suicide, they do not help T. Glover state a plausible claim that Rice is not entitled to qualified immunity.  The distinction between a prisons official's failure to heed a pretrial detainee's request to be taken the hospital after being beaten up by four inmates in Lopez v. LeMaster, and providing razors to a detainee to shave for trial, who thereafter takes his own life, "might make a constitutional difference."  Kerns v. Bader, 663 F.3d at 1188 (emphasis in original).  See Lopez v. Lemaster, 172 F.3d at 758-759 (after the beating and after the inmate asked for medical attention, the jailor told him: "'You are still conscious, we don't have to take you [to the hospital]'").  In the situation where a person has been beaten, the guards are on notice of serious medical needs; in a suicide case, it may not be that the guards know he has a serious medical need until it is too late.

Moreover, in both Lopez v. Lemaster and Berry v. City of Muskogee, the prison guards had knowledge of facts from which they could determine there was a substantial risk of harm to the defendants by placing them in the cells they did, the guards disregarded those facts, and the guards' disregard of the risk harmed the inmates.  In Lopez v. LeMaster, the prison official twice failed to act when faced with a substantial risk of harm to the detainee: first, when the jailer placed the detainee back in the general population after the detainee told the jailer that another inmate had threatened him with death, claiming the detainee had "mess[ed] with the inmate's mother and sister," and then, after that inmate and three others beat up the detainee, the jail refused to take him to the hospital.  172 F.3d at 758-759.  In Berry v. City of Muskogee, the detainee was placed in a cell with his two co-defendants, whom he had implicated to police, and his wife testified at trial that she had informed a jail employee her husband was afraid they would kill him and asked the jail

employee if he could be moved out of the cell.  See 900 F.2d at 1496-1497.  To find deliberate indifference to the serious medical needs of an inmate or detainee, therefore, is likely to depend upon the guard's knowledge in both the case where other prisoners kill the plaintiff or where the plaintiff takes his own life.  In this case, T. Glover has not alleged that D. Glover told Rice or anyone else that he planned to kill himself, or that Rice otherwise had any facts from which he could determine there was a substantial risk of harm to D. Glover if left alone to shave.

It is clearly established in the Tenth Circuit that the duty to provide adequate medical care to inmates and even detainees under the Eighth and Fourteenth Amendments includes a duty to prevent suicide.  See Gaston v. Ploeger, 229 F.App'x at 709-710 ("Claims arising from a failure to prevent prisoner suicide 'are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody.'")(quoting Barrie v. Grand County, 119 F.3d at 866.  It is also clear, however, that a plaintiff cannot allege mere negligence on behalf of the prison officials, but to allege a violation of a clearly established constitutional right, a plaintiff must allege that the particular prison official knew that a serious risk of the prisoner detainee committing suicide existed, and disregarded that risk in her or his conduct.  See Gaston v. Ploeger, 229 F.App'x at 710 ("[A] prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.")(quoting Farmer v. Brennan, 511 U.S. at 837).  Under the clearly established law, T. Glover must allege, therefore, that Rice, in handing D. Glover the razors to shave, knew there was a risk that D. Glover would kill himself with the razors, Rice appreciated this risk, and then consciously disregarded this risk by intentionally leaving D. Glover unsupervised.  Were these the allegations, the Court likely would say that such deliberate conduct evinces that Rice was

-41-

deliberately indifferent to the risk of D. Glover committing suicide; but these allegations are not the case.  See Barrie v. Grand County, 119 F.3d at 869 ("We, therefore, hold that an official . . . acts with deliberate indifference if [the official's] conduct . . . disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights.").

Hence, while the Court can say that "it is inconsistent with the 'basic human need' of reasonable safety knowingly to furnish detainees with items it has been shown they are substantially likely to use to commit suicide -- whether those be razor blades, nooses, or horizontal pipes," Tittle v. Jefferson County Com'n, 10 F.3d 1525, 1543 (11th Cir. 1994), on the current state of the law, the Court cannot say that handing razor blades to a detainee to shave and leaving him to do so -- without more knowledge of the detainee's suicide risk -- constitutes a constitutional violation under clearly established law.  Instead, the law appears clearly established that there is not a violation under these facts.  The Court will therefore dismiss the claims against Rice.

3.   **Rice's Conduct does not Evince Deliberate Indifference to D. Glover's Medical Needs.**

At first blush, it might seem reckless or deliberately indifferent to give any detainee or inmate razor blades and then leave the detainee or inmate.  The Court has had a couple of detainees and/or convicted inmates commit suicide after they have been given razor blades with which to shave.  In the shock of learning of these deaths, the Court has questioned why the jails or prisons would ever give razor blades to the detainees or inmates.  In the dialogue and conversations, and on reflection, however, it becomes more evident that it is difficult to prevent suicide in prisons just as it is in the general non-detained population.  First of all, a considerable amount of the American

population is in jails or prisons.[8]  Second, intake procedures in jails on any given day, and especially

on a crazy night, can be hectic.  Getting information about the detainee's health, whether physical

or mental, can be difficult, let alone getting accurate information.  Third, men -- and the jail

population is predominantly men -- need to shave.  It is what most men do and is, for them, good

grooming.[9]  Fourth, it is particularly important that men shave for trial.  The Court had one

defendant refuse to shave for trial and showed up for a trial by jury with a beard that made him look

strikingly similar to Charles Manson.  Despite the Court's warning to shave before the Court brought

in the venire to begin voir dire, he did not, and the Court proceeded with voir dire.  Before the

second day of trial, after he realized he was in danger of not receiving a fair trial, the defendant

shaved.  On that second day, fully shaved, the defendant appeared for trial looking like a gentle --

much more innocent -- defendant.  The Court has, in its experience seen how important shaving is

for a defendant on trial.  Hence, it is reluctant to say that shaving in jail will or should go away.

Because the will to live is so innate in most people, leaving most people, even most people

in jail or prison, with a razor blade to shave is not a problem.  While suicides are tragic, it does not

make a lot of sense to impose on jail and prison guards the constitutional duty to watch all prisoners

or inmates every time they shave.  See Gaston v. Ploeger, 229 F.App'x at 711 ("[J]ailers are neither

obligated nor able to watch every inmate at every minute of every day.").  For the vast majority of

---

[8]See Paul Guerino et al., Prisoners in 2010, Bureau of Justice Statistics, 1 (Feb 9, 2012), available at http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=2230 ("The 2010 imprisonment rate for the nation was 500 sentenced prisoners per 100,000 U.S. residents, which is 1 in 200 residents.").

[9]Approximately ninety-four million men in the United States ages fifteen and over shave an average of about five times per week.  See O. Ferrell & M. Hartline, Marketing Strategies 306 (5th Ed. 2011).  With a male population of just over 122 million as of July 2012, see The World Factbook, Central Intelligence Agency, http://www.cia.gov/library/publications/the-world-factbook/geos/us.html (last updated Sep. 18, 2012), approximately seventy-five percent of the United States male population shaves, on average, five times each week.

detainees or inmates, on most days, the grooming is uneventful.  All jails and prisons are always struggling for resources.  It does not make sense to impose a constitutional duty to watch men shave or to prohibit giving them razor blades in the first place unless the jail or prison official has some knowledge that the detainee might present a suicide risk.

People can slide into depression and suicidal tendencies very quickly.  The Court has had a defendant before him in the afternoon and dead by night.  And when people get to that point, and are determined, there is very little society can do to prevent the suicide.  Where there is the will, there is usually a way.  In a very real way, the Constitution protects detainees and inmates more than people in society, because in jails and prisons, the jail cannot be indifferent to the medical needs of the detainees or prisoners, whereas, in society, the public can know of a person's suicide risk and, generally, without liability, can fail to do much to protect the person from suicide.  To hold prison officials liable for the suicide of a detainee without any knowledge or sign of the detainee's risk of suicide would be close to imposing a negligence standard or a strict liability standard on prisons and their employees.

Because T. Glover does not allege any facts that plausibly show Rice knew of D. Glover's intent to commit suicide or any facts from which the Court may infer that he knew D. Glover was a suicide risk, the Court believes, as a matter of law, that Rice did not act with deliberate indifference in giving D. Glover a razor so that he could shave before trial and leaving him to so. The Court will therefore dismiss T. Glover's substantive due-process claims against Rice.

**B    COLLINS IS ENTITLED TO QUALIFIED IMMUNITY ON THE CONSTITUTIONAL CLAIM AGAINST HIM BECAUSE HE DID NOT VIOLATE D. GLOVER'S DUE-PROCESS CLAUSE RIGHTS.**

Collins did not violate D. Glover's constitutional right by failing to respond to D. Glover's calls for help.  There is no clearly established right to have guards respond to emergency calls unless

the guards hear the calls.  Here, T. Glover cannot allege that Collins heard D. Glover's calls.

### 1.    Rice did not Violate D. Glover's Substantive Due Process Clause Rights.

T. Glover alleges in the "General Allegations" that Collins "was on duty on April 12 . . . and was charged with the responsibility of maintaining the safety of the inmates," Complaint ¶ 12, at 3, and that Collins' conduct violated D. Glover's constitutional rights because Collins "didn't do it." Tr. at 18:18-20 (Proctor).  T. Glover alleges that LCDC and "its officers and employees actively ignored [Glover's] pleas for help" after he had cut himself.  Complaint ¶ 26, at 5.  Nowhere in the Complaint, however, does T. Glover allege that Collins was aware of D. Glover's pleas or that Collins knew that D. Glover "tried to communicate an emergency situation to the [LCDC] Officers by pushing the emergency buttons for help, thus 'pleading' for help." Complaint ¶ 19, at 4.  Because the Complaint incorporates the prior allegations into each successive count that T. Glover alleges, the Court asked T. Glover at the hearing to give the Court any additional facts that he had discovered, and to clarify what theories he was advancing for his allegations against Collins.  See Tr. at 16:10-22, 17:20-18:20 (Court, Proctor).  T. Glover stated that he was relying on Lopez v. LeMaster for the proposition that Collins' failure to maintain D. Glover's safety was a failure to protect a detainee, and thus a deprivation of Glover's substantive due-process rights.  See Tr. at 17:23-20 (Proctor, Court).  T. Glover is therefore not alleging that Collins was an officer included in the allegation that LCDC officers and its employees "actively" ignored D. Glover's pleas for help. Complaint ¶ 26, at 5.  T. Glover, rather, is alleging that D. Glover's death resulted from Collins' failure to affirmatively act to maintain the safety of the inmates and that the failure to act  is the conduct that violated his constitutional rights.  Viewing the allegations against Collins in "the light most favorable" to T. Glover, therefore, and making all reasonable inferences in his favor, Smith v. United States, 561 F.3d at 1098, T. Glover alleges Collins deprived D. Glover of his Due Process

Clause rights, because Collins was responsible for the safety of the inmates at the time D. Glover committed suicide and Collins failed to prevent D. Glover from doing so.

T. Glover does not make a sound argument that Collins is not entitled to qualified immunity by alleging that D. Glover's suicide was a product of Collins' failure to discharge his duty to take reasonable measures to insure the safety of a detainee or that Collins violated D. Glover's substantive due-process clause rights.  While T. Glover alleges that Rice and D. Glover interacted, he does not allege that Collins interacted with D. Glover at all or even knew the circumstances of his detention.  T. Glover thus does not allege that Collins knew that D. Glover intended to kill himself or that he was a obvious suicide risk.  T. Glover also does not allege that Collins understood and disregarded such knowledge.  And when given the opportunity to state more facts at the hearing, T Glover could not state that he had more facts to allege.  T. Glover therefore does not allege sufficient facts to plausibly show that Collins acted with "deliberate indifference" to D. Glover's medical needs in not preventing D. Glover from committing suicide. Without alleging any conduct that connects Collins in any way to D. Glover or to his suicide, T. Glover fails to "allege facts sufficient to show (assuming they are true) that" Collins "plausibly violated" D. Glover's due-process clause right to be adequately protected from committing suicide.  Robbins v. Oklahoma, 519 F.3d at 1249.

T. Glover's allegations against Collins, rather, amount to an assertion that,  because Collins was generally responsible for the inmates' safety, Collins was deliberately indifferent to the need to prevent D. Glover from committing suicide because D. Glover did so.  Should the Court find that Collins' mere status here is sufficient "individual action[] [to find that he] has violated the Constitution," Ashcroft v. Iqbal, 556 U.S. at 676, without allegations that he at least had knowledge of D. Glover's intention to commit suicide, or knowledge of his emergency calls for help, if he did

so, it would be a departure from the general policy that "public employees who are just doing their jobs are generally immune from suit," Lewis v. Tripp, 604 F.3d at 1230. The Court declines to make such a departure and rather finds that Collins is entitled to qualified immunity. Collins may have been in a part of the building where he could not hear the pleas, and his failure to hear or put himself in a position to hear may be negligence. On the allegations in the Complaint, however, T. Glover has failed to meet his burden of pleading, with sufficient specificity, that any of Collins' conduct plausibly violated D Glover's substantive due-process right. Qualified immunity, therefore, bars T. Glover's substantive due-process clause claims against Collins, and the Court will dismiss the claims as to him.[10]

> **2.      The Substantive Due-Process Right of a Detainee to Have an Officer Come When the Detainee Calls is not Clearly Established Where There is No Evidence That the Agent Heard the Call or Knew of the Suicide Risk.**

To decide whether Collins' alleged conduct violates one of D. Glover's "clearly established constitutional rights," the Court must determine whether "existing precedent . . . placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S.Ct. at 2084. To find that the constitutional question has been placed beyond debate, defining the level of generality at which the legal rule is defined is important, because qualified immunity exists for the purpose of protecting government officers from liability where they act upon a reasonable, but mistaken belief in the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Court will first define the law at the most general level. Even though the government

---

[10]For the same reason, to the extent that T. Glover is alleging that Rice did not respond to the calls for help, the Court dismisses the claims against him for the same reason. There is no allegation that Rice heard any calls for help or had any knowledge or indication that D. Glover would be calling for help.

generally does not violate a citizen's rights for failing to protect the citizen from harm, because LCDC was holding D. Glover as a pretrial detainee, D Glover's substantive-due process clause rights imposed upon LCDC "an affirmative duty" to take "reasonable measures to insure [D. Glover's] safety" while he remained in its custody.  Lopez v. LeMaster, 172 F.3d at 759 ("[N]either prison officials nor municipalities can absolutely guarantee the safety of their prisoners . . . . They are, however, responsible for taking reasonable measures to insure the safety of inmates.")(citing Berry v. City of Muskogee, 900 F.2d at1499)(internal citations omitted).  See Uhlrig v. Harder, 64 F.3d at 572 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").  It is clear from existing Tenth Circuit precedent that the failure to provide medical care to detainees violates this duty and is a violation of the detainees' Fourteenth Amendment Due Process Clause rights.  See Barrie v. Grand Cnty., 119 F.3d at 867 ("Under the Fourteenth Amendment's due process clause, pretrial detainees, like Frohmader[ v. Wayne, 958 F.2d 1024 (10th Cir. 1992)], are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment.").  Moreover, existing Tenth Circuit precedent puts beyond question that there is a constitutional right to be adequately protected while held as a detainee, and that this right can violated by a prison officials' failure to prevent detainee suicide.  See Gaston v. Ploeger, 229 F.App'x at 709-710 ("Claims arising from a failure to prevent prisoner suicide 'are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody.'")(quoting Barrie v. Grand County, 119 F.3d at 866).  D. Glover therefore had a clearly established constitutional right as a detainee to be provided adequate medical care, including being adequately protected from committing suicide.

The law is less clear, however, that a jail has to screen all detainees for psychological

problems to prevent suicide.  The law imposes on guards a knowledge requirement.  Before the guard can violate a detainee's or inmate's constitutional right to be provided adequate medical care and protect the detainee or inmate from committing suicide, the guard has to know that a risk of suicide exists.  If the guard does not know of the psychological problems and associated risk of suicide, then the guard does not have to take any measures to prevent suicide.

The grey area in constitutional rights of detainees may be what efforts prison officials may have to take to learn of detainees' or inmates' psychological problems.  If a detainee is handed an intake form and does not check the box for psychological problems, but completes the rest, it would probably be best practices for the nurse or intake person to look at the form immediately, see if it is complete, and demand that it be completed if it is not.  The Court cannot, however, say that the blank form in this case equates to knowledge; the intake person's culpability with regard to any psychological problems here seems more negligent than intentional or reckless.

It is therefore not clearly established that D. Glover had a constitutional right, of which a reasonable officer responsible for the safety of the inmates would have known, that Collins violated by not preventing D. Glover's suicide.  Without any knowledge of D. Glover's intention to commit suicide, knowledge that he was an obvious suicide risk, or knowledge of his emergency calls for help, if they occurred, the failure to act was negligent, not deliberately indifferent.  Qualified immunity therefore bars T. Glover's substantive due-process claims against Collins, and the Court will dismiss the claims as to him.[11]

---

[11]For the same reasons, Rice did not violate any of D. Glover's clearly established rights by failing to respond to the calls.

### 3.   Collins' Conduct Does Not Evince Deliberate Indifference to D. Glover's Medical Needs.

Without alleging any facts indicating that Collins knew of or appreciated the risk that D. Glover would commit suicide, or that Collins was alerted that D. Glover was attempting to plea for attention after he cut himself with the razors, the Court cannot find that Collins' conduct evidenced deliberate indifference to D. Glover's risk of suicide.  Jails and prisons do not have the resources available should there be imposed upon every prison officer the "duty to monitor inmates constantly."  Gaston v. Ploeger, 229 F.App'x at 711. While suicide is extremely regrettable and sad in any situation, in the prison context, a duty to prevent an almost unpredictable event should not be imposed unless the jail officials know the detainee presents a suicide risk.  The Court will, therefore, dismiss the substantive due-process claims against Rice and Collins.[12]

Because T. Glover fails to meet his burden to show that Rice or Collins are not entitled to qualified immunity, T. Glover's "statement of the claim" in Claim III does not show that he is "entitled to relief," and the Court will dismiss the Count III allegations against both Rice and Collins.  See Fed. R. Civ. P. 8(a)(2).

## III.   GLOVER FAILS TO SUFFICIENT STATE A PLAUSIBLE CLAIM AGAINST COLLINS OR RICE UNDER THE NMTCA.

As a threshold matter, T. Glover's Complaint fails to identify the specific section of the NMTCA pursuant to which he is bringing his claim.  T. Glover may not sue a New Mexico governmental entity or its employees acting within the scope of their duties, unless he is bringing his claim pursuant to one of the specific exceptions within the NMTCA.  See NMSA 1978, § 41-4-4(A); Begay v. State, 104 N.M. at 486 ("Consent to be sued may not be implied, but must come

---

[12]For the same reasons, the Court is not persuaded that Rice's failure to respond to the emergency calls was deliberately indifferent to D. Glover's medical needs.

within one of the exceptions to immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay, 104 N.M. 375.  Nevertheless, based on the allegations in T. Glover's Complaint, and his statements at the hearing, the Court will construe T. Glover's state law claim against Rice and Collins as brought pursuant to NMSA 1978, § 41-4-12, which excepts for sovereign immunity liability "for . . . wrongful death . . . or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties."[13]

T. Glover's state law claims, however, cannot survive Rice and Collins' motion to dismiss, because T. Glover does not, with sufficient specificity, tie his state law claim to any "certain torts or violations of rights" sufficient for a waiver of liability.   McDermitt v. Corrections Corp. of America, 112 N.M. 247, 248, 814 P.2d 115, 116 (Ct. App. 1991).  "The language of Section 41-4-12 explicitly ties the waiver of immunity to certain torts or violations of rights . . . [and a] plaintiff cannot recover for negligent . . . supervision in the absence of either a tort listed in Section 41-4-12 or a deprivation of a right secured by the federal or state constitution or laws."   McDermitt v. Corrections Corp. of America, 112 N.M. at 248, 814 P.2d at 116.  T. Glover alleges that his New Mexico Constitutional Article II, § 18,[14] rights were violated in that "the Defendants herein above deprived [D. Glover] of "his right to be incarcerated . . . without fear of the loss of his life."

---

[13]To the extent that T. Glover brought his state law claims for deprivation of rights "secured by the constitution and laws of the United States," NMSA 1978, § 41-4-12, the Court will not address those claims again in this section, having already done so in sections I and II, supra at 32-39.

[14]Article II, § 18 of the New Mexico Constitution is the constitutional provision containing the New Mexico due-process clause: "No person shall be deprived of life, liberty or property without due process of law. . . ."

Complaint ¶ 36, at 7.[15]  This assertion, incorporating Rice and Collins as defendants, though not explicit, may reasonably be construed as a substantive due-process clause claim for a failure to protect a pretrial detainee, or, more precisely, as a prison officials' deliberate indifference to his serious medical needs.[16]

T. Glover does not present the Court with any authority that these substantive due-process rights under the New Mexico Constitution would differ from the standard set forth in the analysis of these rights using the United States Constitution, nor does he contend that the standard for his due process assertions differ under the United States and New Mexico Constitutions.  The Court therefore analyzes the substantive due-process claim under the federal constitutional analysis.  See E. Spire Communications, Inc. v. Baca, 269 F.Supp.2d 1310, 1324 (D.N.M. 2003)(Smith, J.)(using the federal standard to analyze the plaintiff's claims for violation of substantive due-process rights under the New Mexico Constitution because the plaintiff did not present any authority that the standard under the New Mexico Constitution would differ from the standard under the United States Constitution); see also Christian Child Placement Service of the N.M. Christian Children's Home

---

[15]T. Glover's Complaint also alleges that the "Defendants'" acts and conduct were a deprivation and violation of his rights under Article II, section 10 of the New Mexico Constitution. Because Article II, § 10 of the New Mexico Constitution is the New Mexico equivalent to the United States Constitution's Fourth Amendment right, T. Glover withdrew his claim based on this section and the Court will therefore dismiss the claim.

[16]In paragraph 35 of the Complaint, Glover makes allegations that may be construed as a failure to supervise, as it alleges that LCDC "by and through its employees and Jan Gartman, Warden . . . deprived the Decedent of his New Mexico Constitutional Rights . . . by failing to maintain sufficient supervision and control of her employees."  Amended Complaint ¶ 35, at 7. Although the allegations are against LCDC "employees," which Rice and Collins both were, because neither of them had supervisory roles, and by Glover's use of the pronoun "her," the Court does not find this assertion to be a cause of action alleged against Collins or Rice.  Were this claim intended to be against Rice and Collins, it would fail to state a claim upon which relief can be granted under the federal pleading requirements, because the ambiguity as to its application to them fails to adequately "inform the defendants of the actual grounds of the claim against them."  Robbins v. Oklahoma, 519 F.3d at 1248.

-52-

v. Vestal, 1998–NMCA–098, ¶ 6, 125 N.M. 426, 429, 962 P.2d 1261, 1264 ("[W]hen there is no established precedent, a party seeking relief under state constitutional provision must provide reasons for interpreting state provision differently from the federal provision.")(quoting State v. Gomez, 1997–NMSC–006, ¶ 23, 122 N.M. 777, 784).   It also appears that, based on New Mexico precedent, New Mexico would follow the federal analysis of this issue as it follows the federal analysis of Estelle v. Gamble, 429 U.S. 97 (1976), and its progeny for inmates' and detainees' medical indifference claims.  See State v. Arrington, 115 N.M. 559, 561, 855 P.2d 133, 135 (Ct. App. 1993); State v. Augustus, 97 N.M. 100, 101, 637 P.2d 50, 51 (Ct. App. 2981).

As the Court analyzed in section I-II, supra at 32-39, because T. Glover has not stated, with sufficient specificity, any of Rice's or Collins' conduct which plausibly violated D. Glover's substantive due-process clause rights under the United States Constitution, his state law claims against them alleging a deprivation or violation of his New Mexico substantive due-process clause rights also fail to state a claim upon which relief can be granted.  The Court will therefore dismiss the state law claims against Rice and Collins in Count II.

Because T. Glover fails to meet his burden to show that Collins or Rice deprived D. Glover of any substantive due-process clause right the New Mexico Constitution protects, Glover's "statement of the claim[s]" in Claim II does not show that he is "entitled to relief," and must therefore be dismissed.  See Fed. R. Civ. P. 8(a)(2), 12(b)(6).

**IT IS ORDERED** that the Defendants Christopher Collins and Bradley Rice's Motion to Dismiss Plaintiff's Complaint, filed July 10, 2012 (Doc. 24)("Motion to Dismiss"), is granted. Plaintiff Tyler Glover's claims against Defendants Christopher Collins and Bradley Rice are dismissed with prejudice, and Rice and Collins are dismissed as parties to this case.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Max Houston Proctor
Hobbs, New Mexico

-- and --

Dick A. Blenden
Blenden Law Firm, P.A.
Carlsbad, New Mexico

    *Attorneys for the Plaintiffs*

David W. Bunting
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

    *Attorneys for the Defendants*